UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
ROBERT JUDGE WILBER,                    )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )       Civil Case No. 15-10170-JCB
                                        )
ROBERT CURTIS, BRIAN KINSELLA, and      )
MICHAEL ROGERS,                         )
                                        )
            Defendants,                  )
_____)

**<u>ORDER ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT</u>**

[Dkt. Nos. 44, 47]

September 22, 2016

Boal, M.J.

On November 21, 2011, plaintiff Robert Jude Wilber was arrested by members of the

Town of Falmouth Police Department.  He claims that his arrest and confinement were unlawful

and deprived him of his civil rights pursuant to 42 U.S.C. § 1983 and the Massachusetts Civil

Rights Act.  Dkt. No. 1-2 ("Complaint" or "Compl.") at 14-15.[1]  Wilber also alleges common

law tort claims for false arrest, false imprisonment, malicious prosecution, and intentional

infliction of emotional distress.  <u>Id.</u> at 13-14.

This matter is before the Court on the parties' cross-motions for summary judgment.

Wilber moves for partial summary judgment with respect to his allegations of civil rights

violations, false arrest, and false imprisonment, while the defendants move for summary

judgment on all counts.  Dkt. Nos. 44, 47.  For the reasons set forth below, the Court denies

---

[1] When referring to the parties' pleadings and exhibits, the Court cites to the docket (ECF) page
numbers rather than the page numbers in the original documents.

Wilber's motion and grants the defendants' motion.[2]

## I.   PROCEDURAL HISTORY

On November 20, 2014, Wilber filed a Complaint against Falmouth Police Officers Robert Curtis, Brian Kinsella, and Michael Rogers in Barnstable County Superior Court.  Dkt. No. 1-2.  On February 3, 2016, Wilber moved for partial summary judgment.  Dkt. No. 44. Defendants opposed Wilber's motion on March 11, 2016, and Wilber submitted a reply brief on March 23, 2016.  Dkt. Nos. 57, 64.  On February 4, 2016, the defendants moved for summary judgment with respect to all counts.  Dkt. No. 47.  Wilber opposed the motion on March 11, 2016 and amended his opposition on March 14, 2016.  Dkt. Nos. 52, 60.  Wilber filed a sur-reply on April 21, 2016.  Dkt. No. 73.  The Court heard oral argument on April 27, 2016.  On May 5, 2016, Wilber filed a supplemental memorandum in support of his motion.  Dkt. No. 77.  The defendants filed a response on May 12, 2016.  Dkt. No. 78.

## II.   FACTS[3]

Having previously determined the content of the summary judgment record, see Order on the Parties' Motions to Strike, Dkt. No. 79, this Court turns to a summary of the facts.

---

[2]  On April 28, 2015, all parties consented to the jurisdiction of the undersigned United States Magistrate Judge.  Dkt. No. 25.

[3]  The facts are undisputed unless otherwise noted.  The facts are derived from Wilber's statement of undisputed material facts (Dkt. No. 45) ("Wilber SOF"); defendants' statement of undisputed material facts (Dkt. No. 49) ("Def. SOF"); defendants' response to plaintiff's statement of undisputed material facts (Dkt. No. 57 at 2-6) ("Resp. to Wilber SOF"); and plaintiff's concise statement of material facts in opposition to defendants' motion for summary judgment (Dkt. No. 61) ("Resp. to Def. SOF").  In response to the Def. SOF, Wilber submitted a second statement of material facts (Dkt. No. 61 at 6-22) ("Wilber's 2nd SOF").  The defendants responded to Wilber's 2nd SOF, but did not dispute the facts contained therein.  Dkt. No. 72. They did, however, move to strike portions of two affidavits Wilber submitted in support of his motion for summary judgment.  Dkt. Nos. 53, 66.

A.   **Background**

Wilber is an individual residing in Falmouth, Massachusetts.[4]  At all times relevant to the instant action, Officer Curtis was a patrolman and Officer Kinsella was a sergeant for the Town of Falmouth Police Department.[5]  Officer Rogers was the booking officer and was not involved in Wilber's arrest.[6]  NSTAR Corporation is a public utility that possesses, through its predecessor in title, a deeded easement over a portion of Wilber's residential property.[7]  The deed grants an "easement to erect, operate, maintain and remove a line . . . for the transmission of electricity . . . . [t]ogether with the right to trim, cut and remove such trees and underbrush as in the judgment of the Grantees may interfere with or endanger said line and equipment and to enter upon said land for any of the aforesaid purposes."  Dkt. No. 46, Ex. A-1.  Vegetation Control Services ("VCS") is a company hired by NSTAR to clear vegetation on its easements in order to provide for the maintenance of power lines and structures so that electricity to the public is not interrupted.[8]

Wilber states that he has been a vocal opponent of NSTAR's program of spraying herbicides on its utility easements, that he petitioned NSTAR officials to limit the scope of its plan to clear-cut the easement over his land, and that he believed NSTAR's program of clear-cutting was overly aggressive.[9]

---

[4] Wilber SOF ¶ 1; Resp. to Wilber SOF ¶ 1.

[5] Wilber SOF ¶¶ 2, 3; Resp. to Wilber SOF ¶¶ 2, 3.

[6] Def. SOF ¶ 60; Resp. to Def. SOF ¶ 60.

[7] Wilber SOF ¶ 4; Resp. to Wilber SOF ¶ 4.

[8] Def. SOF ¶ 4; Resp. to Def. SOF ¶ 4.

[9] Wilber SOF ¶¶ 5-7.

One week prior to Wilber's arrest, Wilber went to the site where VCS was working.[10] Wilber maintains that he verbally confronted VCS workers to protest the work they were doing on behalf of NSTAR, but the defendants admit only that a VCS employee, Kenneth Swanson, stated that Wilber interacted with members of the VCS work crew and that Wilber had been "hassling him, taking pictures."[11]  As a result of Wilber's confrontation with the VCS crew members, VCS requested a police presence at the worksite.[12]  Swanson testified that he was concerned that VCS vegetation clearing machines could throw off brush at a distance of forty to fifty feet, and he believed that a police detail could protect citizens from getting hurt if they ventured into the worksite.[13]

### B.   The Arrest

On November 21, 2011, Officers Curtis and Kinsella were assigned to work a paid detail for VCS.[14]  They walked with two VCS employees as they measured the clearing distance from the center of the power lines toward the abutting properties and marked the clearing area with red tape tied off to tree limbs.[15]  Wilber went into a "high state of agitation" after seeing the cutting crews on the easement behind his house.[16]  Wilber observed chainsaws and heavy-duty

---

[10] Wilber SOF ¶¶ 8-9; Resp. to Wilber SOF ¶ 9.

[11] Wilber SOF ¶¶ 8, 10; Resp. to Wilber SOF ¶ 10; Def. SOF ¶ 6; Resp. to Def. SOF ¶ 6.

[12] Def. SOF ¶ 5; Resp. to Def. SOF ¶ 5; Wilber SOF ¶ 9; Resp. to Wilber SOF ¶ 9.  The parties dispute the underlying details of this conversation.  Def. SOF ¶¶ 5, 7, 9; Resp. to Def. SOF ¶¶ 5, 7, 9.

[13] Def. SOF ¶¶ 58-59.  Wilber admits that these statements accurately reflect Swanson's testimony, but disputes their factual accuracy.  Resp. to Def. SOF ¶¶ 58-59.

[14] Def. SOF ¶ 3; Resp. to Def. SOF ¶ 3.

[15] Def. SOF ¶ 10; Resp. to Def. SOF ¶ 10.

[16] Def. SOF ¶ 11; Resp. to Def. SOF ¶ 11.

machinery in action within the clearing area.[17]  Wilber vocally protested and strung yellow caution tape and plastic rope across the easement.[18]  Wilber further claims that: (1) he took these actions in order to protest the clear-cutting, (2) the tape posed no hazard to anyone working in the area, and (3) clear-cutting has caused severe damage to his land.[19]

A VCS employee told Officers Curtis and Kinsella that Wilber put yellow caution tape across the area, and a large wheeled clearing machine stopped working around this time.[20] Officer Curtis observed the tape "zig-zagged" across the easement and saw Wilber, who was standing in the easement, taking pictures.[21]  Officers Curtis and Kinsella worked with two VCS crewmembers to remove the yellow caution tape.[22]  The removal process caused an interruption to the work of the VCS crew.[23]  Officer Kinsella told Wilber that he would be placed under arrest if he interfered with the removal of the vegetation within the easement.[24]  Wilber admitted to placing the tape across the easement, told Officers Curtis and Kinsella that the clear-cutting work must stop, and claimed that a state representative would stop the land clearing until further talks could be held between the property owners and NSTAR.[25]  The state representative,

---

[17] Def. SOF ¶ 12; Resp. to Def. SOF ¶ 12.

[18] Def. SOF ¶ 13; Resp. to Def. SOF ¶ 13; Wilber SOF ¶¶ 11.

[19] Wilber SOF ¶¶ 11-14.

[20] Def. SOF ¶¶ 14-16; Resp. to Def. SOF ¶¶ 14-16.  The parties dispute whether the machine stopped *so that* the tape could be removed.

[21] Def. SOF ¶¶ 17-18; Resp. to Def. SOF ¶¶ 17-18; Wilber SOF ¶ 16; Resp. to Wilber SOF ¶ 16.

[22] Def. SOF ¶ 19; Resp. to Def. SOF ¶ 19.

[23] Id.

[24] Def. SOF ¶ 20; Resp. to Def. SOF ¶ 20; Wilber SOF ¶ 16; Resp. to Wilber SOF ¶ 16.

[25] Def. SOF ¶¶ 21-24; Resp. to Def. SOF ¶¶ 21-24.

however, had told Wilber that he could not do anything to stop VCS.[26]  Officer Kinsella informed Wilber that the work would not stop absent a court order.[27]

Officer Kinsella told Wilber to stand outside the marked easement area while the crew was working, and Wilber eventually walked back toward his property after stating that he would not leave the area.[28]  Wilber then proceeded to come and go from the work area, returning into the worksite and disregarding Officer Kinsella's requests not to do so.[29]  Defendants state that at the time, three VCS workers were actively using chainsaws and a Hydro-Axe land clearer.[30]  Wilber admits that when he reentered the worksite, a large machine was in use eighty to one hundred feet away, a chainsaw was in use fifty feet away, and another chainsaw was being sharpened twelve to fifteen feet away.[31]  The big machines and large chainsaw were making a lot of noise.[32]  The VCS employee who was working with a chainsaw twelve feet away moved away from Wilber.[33]  Throughout the day, numerous workers moved in and out of the worksite, including workers using heavy equipment.[34]

Officer Kinsella asked Wilber to stay outside the red tape markers, but Wilber ultimately refused to leave the worksite and sat down on a freshly cut stump "in a feeling of defeat."[35]  At

---

[26] Def. SOF ¶ 26; Resp. to Def. SOF ¶ 26.

[27] Def. SOF ¶ 25; Resp. to Def. SOF ¶ 25.

[28] Def. SOF ¶¶ 27-28; Resp. to Def. SOF ¶¶ 27-28.

[29] Def. SOF ¶¶ 29-30; Resp. to Def. SOF ¶¶ 29-30.

[30] Def. SOF ¶ 33.

[31] Resp. to Def. SOF ¶¶ 33, 38.

[32] Def. SOF ¶ 44; Resp. to Def. SOF ¶ 44.

[33] Def. SOF ¶ 40; Resp. to Def. SOF ¶ 40.  The parties dispute *why* the worker moved away from Wilber.

[34] Def. SOF ¶ 41; Resp. to Def. SOF ¶ 41.

[35] Def. SOF ¶¶ 31-32, 39; Resp. to Def. SOF ¶¶ 31-32, 39.

some point in and around the time when Wilber sat on the stump, the VCS crew halted their work.[36]  Wilber yelled out to the workers, exclaiming that they 'didn't have to do this.'[37]  After about two minutes of Wilber sitting on the stump, Officers Curtis and Kinsella approached him, and Officer Curtis once again asked Wilber to move away from the workers and out of the work area.[38]  Wilber refused to move and Officer Curtis told Wilber that if he did not move, he could be placed under arrest.[39]  In and around this time, Wilber took several photographs of the area, machinery, and workers.[40]  Officer Curtis gave Wilber three separate warnings to leave the worksite.[41]  At his third warning, Officer Curtis told Wilber: "if you don't move, I'm going to arrest you."[42]  In response, Wilber stood up, placed his hands behind his back, and did not resist arrest.[43]  Officer Curtis placed Wilber in handcuffs within the boundary of the easement and escorted him to a cruiser.[44]  Officer Kinsella assisted Wilber's friend in accessing Wilber's van so that he could be picked up from the courthouse.[45]

Wilber was transported to the police station, booked by Officers Curtis and Rogers, and charged with disorderly conduct.[46]  On November 21 and 25, 2011, Officers Curtis and Kinsella

---

[36] Def. SOF ¶¶ 37, 45; Resp. to Def. SOF ¶¶ 37, 45.  Defendants state that work stopped after Wilber sat on the stump, while Wilber maintains that work had stopped prior to his sitting on the stump.  Id.

[37] Def. SOF ¶¶ 34-35; Resp. to Def. SOF ¶¶ 34-35; Wilber SOF ¶ 21; Resp. to Wilber SOF ¶ 21.

[38] Def. SOF ¶¶ 36, 43, 46; Resp. to Def. SOF ¶¶ 36, 43, 46.

[39] Def. SOF ¶¶ 46-47; Resp. to Def. SOF ¶¶ 46-47.

[40] Def. SOF ¶¶ 62-68; Resp. to Def. SOF ¶¶ 62-68.

[41] Def. SOF ¶¶ 47-51; Resp. to Def. SOF ¶¶ 47-51.

[42] Def. SOF ¶ 51; Resp. to Def. SOF ¶ 51.

[43] Def. SOF ¶ 52; Resp. to Def. SOF ¶ 52; Wilber SOF ¶ 25; Resp. to Wilber SOF ¶ 25.

[44] Def. SOF ¶¶ 53, 55; Resp. to Def. SOF ¶¶ 53, 55.

[45] Def. SOF ¶ 54; Resp. to Def. SOF ¶ 54.

[46] Def. SOF ¶¶ 56-57; Resp. to Def. SOF ¶¶ 56-57.

wrote police reports related to Wilber's arrest.  Dkt. No. 49-1 at 5-8.  Officer Rogers was not involved in the arrest and did not read any police report relating to Wilber on the day of the arrest.[47]  Wilber was moved to Falmouth District Court, where he was placed in leg shackles and handcuffs, and held in a cell awaiting arraignment.[48]  Eventually, that same day, an application for a criminal complaint for one count of disorderly conduct was filed against Wilber in Falmouth District Court.[49]  On October 15, 2012, the criminal charge against Wilber was dismissed upon request of the Commonwealth.[50]

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case."  Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 855 (1st Cir. 2008) (quoting Calero-Cerezo v. United States Dep't. of Justice, 355 F.3d 6, 19 (1st Cir. 2004)).

The Court "must scrutinize the evidence in the light most agreeable to the nonmovants, who are entitled to the benefit of all reasonable inferences therefrom."  Ahern v. Shinseki, 629 F.3d 49, 53-54 (1st Cir. 2010) (citing Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004)).  "A properly supported summary judgment motion cannot be defeated by relying upon conclusory

---

[47] Def. SOF ¶¶ 60-61; Resp. to Def. SOF ¶¶ 60-61.

[48] Wilber SOF ¶ 34.  Defendants deny this assertion, but do not actually dispute that he was placed in leg manacles.  Resp. to Wilber SOF ¶ 34.  None of the defendants, themselves, put leg manacles on Wilber.  See Dkt. No. 63-2 at 22-23.

[49] Wilber SOF ¶¶ 33, 35; Resp. to Wilber SOF ¶¶ 33, 35; Wilber Aff. 1, Ex. A-6.

[50] Wilber SOF ¶ 36; Resp. to Wilber SOF ¶ 36; Wilber Aff. 1, Exs. A-7, A-8.

allegations, improbable inferences, acrimonious invective, or rank speculation." Id. (citations omitted).

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se*." Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996). "Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Id. "Where, as here, a district court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism." Estate of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010) (citing Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996) ("Barring special circumstances, the nisi prius court must consider each motion separately, drawing inferences against each movant in turn.")).

## IV.   DISCUSSION

Both parties move for summary judgment on Wilber's claims for civil rights violations (Counts V and VI), false arrest (Count I), and false imprisonment (Count II). Dkt. Nos. 44, 47. The defendants also move for summary judgment on Wilber's claims for malicious prosecution (Count III) and intentional infliction of emotional distress (Count IV). Dkt. No. 47.

### A.   Civil Rights Violations

#### 1.   Section 1983

Section 1983 is a vehicle through which individuals may sue certain persons acting under the color of state law for deprivation of federally assured rights. Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008). Specifically, Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Section 1983 is "not itself a source of substantive rights, but merely provides

a method for vindicating federal rights elsewhere conferred."  Graham v. Connor, 490 U.S. 386,

393-4 (1989).

"A claim under Section 1983 has two essential elements.  First, the challenged conduct

must be attributable to a person acting under color of state law" and "second, the conduct must

have worked a denial of rights secured by the Constitution or by federal law."  Soto v. Flores,

103 F.3d 1056, 1061 (1st Cir. 1997).  Here, defendants do not dispute that they were acting under

color of state law.  They do dispute, however, that their conduct denied Wilber a constitutional

right.  To the extent that the defendants' actions violated Wilber's constitutional rights, they

argue that they are shielded from liability by the doctrine of qualified immunity.

### 2.      Massachusetts Civil Rights Act ("MCRA")

The MCRA provides, in relevant part:

> Whenever any person or persons, whether or not acting under color of law,
> interfere by threats, intimidation or coercion, or attempt to interfere by threats,
> intimidation or coercion, with the exercise or enjoyment by any other person or
> persons of rights secured by the constitution or laws of the United States, or of
> rights secured by the constitution or laws of the commonwealth, the attorney
> general may bring a civil action for injunctive or other appropriate equitable relief
> in order to protect the peaceable exercise or enjoyment of the right or rights
> secured.

M.G.L. c. 12, § 11H.  Accordingly, the MCRA authorizes civil actions by any person subjected

to an interference of rights as described in Section 11H.  M.G.L. c. 12 § 11I.  Liability under the

MCRA may be predicated upon violations of either the federal or state constitutions.  Nuon v.

City of Lowell, 786 F. Supp. 2d 323, 330 n.3 (D. Mass. 2011).  "The MCRA is coextensive with

42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State

counterpart does not, and the derogation of secured rights must occur by threats, intimidation, or coercion."  Sietins v. Joseph, 238 F. Supp. 2d 366, 377-78 (D. Mass. 2003) (quotations and citations omitted).  The MCRA affords the same standards of qualified immunity for public officials as that applicable under Section 1983.  Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 595 (2001).

The MCRA's additional requirement that a derogation of a secured right occur by threats, intimidation, or coercion distinguishes valid claims under the MCRA from those under Section 1983.  For purposes of the MCRA, a "threat" involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm, "intimidation" involves putting in fear for the purpose of compelling or deterring conduct, and "coercion" involves the application to another of such force, either physical or moral, as to constrain a person to do against his will something he would not otherwise have done.  Farrah v. Gondella, 725 F. Supp. 2d 238, 247 (D. Mass. 2010) (citing Planned Parenthood League of Massachusetts v. Blake, 417 Mass. 467, 474 (1994)).

### 3.    Probable Cause

Under the Fourth Amendment to the United States Constitution, the right to be free from unreasonable searches gives rise to a requirement that an arrest be supported by probable cause.[51] See Beck v. Ohio, 379 U.S. 89, 91 (1964).  Therefore, an arrest is lawful if an officer has probable cause.  Holder v. Town of Sandown, 585 F.3d 500, 504 (1st Cir. 2009) (citing Tennessee v. Garner, 471 U.S. 1, 7 (1985)).  "A police officer has probable cause when, at the

---

[51] The standard for probable cause for arrest under Article 14 of the Massachusetts Declaration of Rights mirrors that of the Fourth Amendment to the United States Constitution.  Nuon, 768 F. Supp. 2d at 330 (citing Commonwealth v. Kotlyarevskiy, 59 Mass. App. Ct. 240, 243 (2003), Commonwealth v. Santaliz, 413 Mass. 238, 240-41 (1992)).

time of the arrest, the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Id. (citations omitted).

In determining whether an officer has probable cause, this Court must view the circumstances from the perspective of a reasonable person in the position of the officer. Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 255 (1st Cir. 1996). Probable cause requires only a probability that the defendant committed the crime. Holder, 585 F.3d at 504 (citations omitted). "The test for probable cause does not require the officers' conclusion to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable." Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 11 (1st Cir. 2004) (internal quotation marks and citation omitted).

Whether the officers had probable cause to arrest is an objective inquiry. Holder, 585 F.3d at 504 (citing Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004)). "The 'actual motive or thought process of the officer is not plumbed.'" Id. Rather, the probable cause analysis entails an objective assessment of the officers' actions in light of the facts and circumstances confronting them at the time. Nuon, 786 F. Supp. 2d at 330 (citing Maryland v. Macon, 472 U.S. 463, 470-71 (1985)). Probable cause determinations are "preliminary and tentative." Acosta, 386 F.3d at 11 (citation omitted). Accordingly, police officers do not have a standing obligation to investigate potential defenses before finding probable cause. Id. (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)). In most circumstances, an officer may terminate his investigation when he accumulates facts that demonstrate sufficient probable cause. Id. (citations omitted).

The probable cause justifying a lawful arrest need not be for the charge eventually prosecuted; rather, a finding of probable cause need only exist as to *any* offense that could be charged under the circumstances.  See United States v. Bizier, 111 F.3d 214, 218-19 (1st Cir. 1997).  "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001).  Accordingly, even an arrest that violates state law does not result in a *per se* violation of the plaintiff's rights because the only relevant inquiry is whether there was probable cause that any arrestable offense was committed.  Goddard v. Kelley, 629 F. Supp. 2d 115, 125-26 (D. Mass. 2009).

Where there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them, the existence of probable cause is an issue for the jury, but, where the facts are established or undisputed, the issue becomes a mixed question of law and fact suitable for determination by the court.  Nuon, 768 F. Supp. 2d at 330 (citing Maxwell v. City of Indianapolis, 998 F.2d 431, 434 (7th Cir. 1993)).

### 4.    Analysis

Wilber contends that because he was engaged in constitutionally protected speech, the Falmouth Police Officers lacked probable cause to arrest him for disorderly conduct, and therefore, his arrest amounted to a violation of his civil rights.  Dkt. No. 45 at 10-11.  The defendants counter that at the time of Wilber's arrest, Officers Curtis and Kinsella had probable cause to arrest him not only for disorderly conduct pursuant to M.G.L. c. 272, § 53, but also for other crimes, including disturbing the peace.  Dkt. No. 48 at 7.  For the reasons set forth below, the Court finds that the defendants had probable cause to arrest Wilber on November 21, 2011.

i.      <u>Probable Cause: Disorderly Conduct</u>

a.      <u>Standard Of Law</u>

Under Massachusetts law, it is a criminal offense to be a "disorderly person." Mass. Gen. Laws ch. 272, § 53 ("Section 53").[52] The term disorderly as defined by Section 53 has had a tortured history in Massachusetts jurisprudence. <u>Nuon</u>, 768 F. Supp. 2d at 330 (citing <u>Commonwealth v. Sholley</u>, 432 Mass. 721, 727 (2000)). Indeed, the SJC has repeatedly clarified and construed the meaning of disorderly conduct such that Massachusetts' present definition of disorderly conduct incorporates only subsections (a) and (c) of the Model Penal Code § 250.2. <u>Id.</u>; <u>see also</u> <u>Commonwealth v. Chou</u>, 433 Mass. 229, 231-32 (2001). These two subsections define a disorderly person as one who, "with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . (a) engages in fighting or threatening, or in violent or tumultuous behavior; or . . . (c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." Model Penal Code § 250.2. The "public" aspect of the conduct is defined as "affecting or likely to affect persons in a place to which the public or a substantial group has access." <u>Commonwealth v. A Juvenile</u>, 368 Mass. 580, 586 (1975).

At oral argument, the defendants stated that Wilber had been arrested under subsection (c). Consequently, in order to show that there was probable cause to believe that Wilber was engaged in disorderly conduct, the defendants must establish that Wilber's conduct (1) created a

---

[52] Section 53 provides, in relevant part: "Common night walkers, common street walkers, both male and female, persons who with offensive and disorderly acts or language accost or annoy another person, lewd, wanton and lascivious persons in speech or behavior, keepers of noisy and disorderly houses, and persons guilty of indecent exposure shall be punished by imprisonment in a jail or house of correction for not more than 6 months, or by a fine of not more than $200, or by both such fine and imprisonment." Mass. Gen. Laws. ch. 272, § 53.

hazardous or physically offensive condition and (2) served no legitimate purpose.

        b.      <u>Hazardous Or Physically Offensive Condition</u>

As a matter of law, there is probable cause to believe Wilber's conduct satisfied the first prong. Wilber walked into and out of an active worksite despite police officers' repeated instructions to stay away from the area.[53] At the time, workers were actively using heavy machinery, including chainsaws and a Hydro-Axe land clearer.[54] A worker also testified that the vegetation clearing machines could throw brush a distance of forty to fifty feet.[55] Given these undisputed facts, there was probable cause to believe that Wilber's refusal to abide by the officers' orders put both himself and the workers at risk of physical harm. Such conduct, and the concomitant safety concern it created, amounts to a hazardous or physically offensive condition. <u>See</u> <u>Commonwealth v. Feigenbaum</u>, 404 Mass. 471, 475 (1989) (conscious disregard of police request created hazardous condition); <u>Commonwealth v. Zettel</u>, 46 Mass. App. Ct. 471, 475 (1999) (failure to move illegally parked car at officer's request potentially created hazardous or physically offensive condition); <u>Abraham v. Nagle</u>, 116 F.3d 11, 14 (1st Cir. 1997) (refusal to obey police may create a safety threat).

        c.      <u>Legitimate Purpose</u>

Whether there was probable cause for the officers to believe that Wilber's conduct served a "legitimate purpose" is a much more difficult and nuanced determination. The SJC has construed subsection (c) to reach only "conduct which involves no lawful exercise of a First Amendment right." <u>A Juvenile</u>, 368 Mass. at 599. Thus, to be disorderly, within the sense of the

---

[53] Def. SOF ¶¶ 27-32; Resp. to Def. SOF ¶¶ 27-32.

[54] Def. SOF ¶ 33.

[55] Def. SOF ¶ 58.

Section 53, the conduct must create a disturbance through acts other than pure speech.  See id. at 597–98.  Furthermore, conduct with legitimate purpose does not constitute disorderly conduct even though it may be criminal under the common law or some other statute.  Feigenbaum, 404 Mass. at 475.

Conduct that has a "legitimate purpose" can include speech designed to call attention to a political cause.  Id.  The term "legitimate purpose," however, is not confined to situations involving political expression.  See Zettel, 46 Mass. App. Ct. at 475-76 (mother's interest in picking up her child at school is a legitimate purpose).  Moreover, where protected speech and unprotected hazardous conduct occur at the same time, the court may consider them separately in its analysis.  See Abraham, 116 F.3d at 14 (finding a defendant's conduct distinct from that of peaceful protesters where a defendant exercised a free speech right to protest an arrest, but also engaged in unprotected conduct by physically interfering with police).

Turning to the facts in this case, Wilber vocally and physically protested the workers' efforts to clear-cut the vegetation on his land by walking through the worksite and stringing yellow caution tape and plastic rope across the easement.[56]  At some point, Wilber sat down on a tree stump and began yelling out to the workers.[57]  Despite multiple warnings from the officers to move back from the workers and out of the work area, Wilber refused.[58]  The defendants argue that Wilber was arrested, not because of his speech, but because his presence in the work area endangered himself, the work crew, and the officers, who had been tasked with keeping the area safe.  Dkt. No. 48 at 10-11.  Defendants further claim that at the time of his arrest, Wilber

---

[56] Def. SOF ¶ 13; Resp. to Def. SOF ¶ 13; Wilber SOF ¶¶ 11-12.

[57] Def. SOF ¶ 34; Resp. to Def. SOF ¶ 34.

[58] Def. SOF ¶¶ 36, 43, 46-51; Resp. to Def. SOF ¶¶ 36, 43, 46-51.

had abandoned his protest activity and had "surrendered" in a feeling of defeat. Id. at 11.

In this case, there exists a tension between Wilber's speech—including his right to verbally protest the clear-cutting—and his conduct, which consisted of physically moving into, out of, and through an active worksite.  In cases such as this, the court may consider the danger caused by the conduct as well as the alleged "legitimate purpose" of the speech.  Compare Abraham, 116 F.3d at 14 (weighing defendant's protected right to protest an arrest against the more dangerous and less legitimate nature of his conduct) with Commonwealth v. Bosk, 29 Mass. App. Ct. 904, 906 (1990) (finding that defendant's challenge to a citation lacked any legitimate purpose as it created a dangerous situation for himself and others).  Recognizing this tension, and viewed in the light most favorable to Wilber, a jury could find that Wilber engaged in protected speech on the morning of November 21, 2011.  A jury could also find that Wilber abandoned that protected activity and engaged in less legitimate and more dangerous conduct in and around the time of his arrest.  Accordingly, there is a dispute as to whether there was probable cause to believe that Wilber was acting to express protected speech at the time of his arrest.  See Abraham, 116 F.3d at 14.

Because there is a genuine dispute of material fact as to whether there was probable cause for the officers believe that Wilber's conduct served a legitimate purpose, and therefore, rose to the level of disorderly conduct at the time of his arrest, neither party is entitled to summary judgment on that basis.

### ii.      Probable Cause: Disturbing The Peace

The Court nevertheless finds, as a matter of law, that the police had probable cause to arrest Wilber on alternative grounds.

a.      Standard Of Law

In Massachusetts, Section 53 prohibits "disturbers of the peace."  Mass. Gen. Laws. ch.

272, § 53.  This phrase is construed in accordance with the common law definition, which makes

it a crime "to disturb the peace of the public, or some segment of the public, by actions, conduct

or utterances, the combination of which constitute[s] a common nuisance."  Commonwealth v.

Federicou, 70 Mass. App. Ct. 711, 714 (2007) (citing Commonwealth v. Jarrett, 359 Mass. 491,

493 (1971)).  Section 53 applies a two-pronged standard to disruptive conduct; specifically, it

proscribes activities which (1) most people would find to be unreasonably disruptive, and (2) did

in fact infringe someone's right to be undisturbed.  Commonwealth v. Orlando, 371 Mass. 732

734-35 (1977).  The mere making of statements is not punishable as a disturbance of the peace.

Jarrett, 359 Mass. at 498.  The first prong protects potential defendants from prosecution based

on individual sensitivities and the second prong requires that the crime have a detrimental

impact.  Orlando, 371 Mass. at 735.  The offense of disturbing the peace uses a normative

standard, which informs a potential defendant that common sense, in most cases, will define the

prohibited conduct.  Id.

b.      Assessment Of Probable Cause

The undisputed facts show that the defendants had probable cause to arrest Wilber for

disturbing the peace.  Wilber did more than merely make statements; Wilber physically intruded

into the workspace and yelled at workers attempting to carry out their employment duties.  There

is evidence that Wilber's actions caused workers to stop what they were doing in order to wait

for Wilber to move, to avoid Wilber, or to expend energy removing the caution tape that Wilber

had hung around the worksite.[59]  Based on this set of facts, it was objectively reasonable for the

---

[59] Def. SOF ¶¶ 14-16, 19, 33, 37, 40, 45; Resp. to Def. SOF ¶¶ 14-16, 19, 33, 37, 40, 45.

officers to have concluded that Wilber was unreasonably disruptive and had infringed on the workers' rights to work safely and undisturbed.

For these reasons, even when viewing the record in the light most favorable to Wilber, the Court finds that the defendants had probable cause to arrest him on November 21, 2011.[60]

### iii.   Analysis Of MCRA Claim

Wilber's MCRA claim fails as well.  The MCRA is narrower than Section 1983 as its remedies are limited to conduct that interferes with a secured right by threats, intimidation, or coercion.  Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 141 n.8 (1st Cir. 2016) (internal quotation marks omitted).  Because this Court has found for the defendants on the Section 1983 claims, Wilber's claims necessarily fail to pass the narrower MCRA test.  Id.

In addition, Wilber has failed to provide any evidence of threats, intimidation, or coercion by the defendants at the time of his arrest.  MCRA claims cannot survive absent some evidence of independent coercive, intimidating, or threatening conduct carried out by the defendants.  See Eason v. Alexis, 824 F. Supp. 2d 236, 245 (D. Mass. 2011) (an alleged constitutional violation cannot also serve as the prerequisite threat, intimidation, or coercion under the MCRA).  Here, Wilber alleges no such conduct by the defendants and the MCRA claim must be dismissed on this basis as well.

Accordingly, with respect to his federal and state civil rights claims, Wilber's motion for summary judgment is denied and the defendants' motion is granted.[61]

---

[60] As the Court has found that the officers had probable cause to arrest Wilber for disturbing the peace, it does not address the other alternative charges argued by the defendants in their memorandum of law.  See Dkt. No. 48 at 12-15.

[61] Because the Court has found that Wilber's Section 1983 and MCRA claims fail, the Court need not address the parties' qualified immunity arguments.  McGunigle v. City of Quincy, No. 15-2224, 2016 WL 4570420 at *10 n.11 (1st Cir. Aug. 31, 2016).

### B.     Tort Claims

#### 1.     False Arrest, False Imprisonment, Malicious Prosecution

To maintain a cause of action for false arrest under Massachusetts law, a plaintiff must establish that the defendants arrested the plaintiff without probable cause.  Campbell v. Casey, No. 14-13714-NMG, 2016 WL 829895, at *5 (D. Mass. 2016).  False imprisonment requires the intentional and unlawful confinement of a person, directly or indirectly, of which the person confined is conscious or is harmed by such confinement.  Nuon, 768 F. Supp. 2d at 336.  Finally, malicious prosecution entails "(1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice."  Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001).

Each of these common law tort claims requires Wilber to establish that his arrest was unlawful and lacked probable cause.  For the reasons stated above, the Court finds that the defendants had probable cause to arrest Wilber on November 21, 2011.  Furthermore, Wilber has made no showing of actual malice by the defendants.  Thus, Wilber's arrest and subsequent confinement and prosecution were lawful.  Accordingly, with respect to Wilber's claims for false arrest and false imprisonment, Wilber's motion for summary judgment is denied and the defendants' motion for summary judgment is granted.  The defendants' motion is also granted with respect to Wilber's claim for malicious prosecution.

#### 2.     Intentional Infliction Of Emotional Distress

To prevail on a claim for intentional infliction of emotional distress, Wilber must prove that: (1) the defendants either intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of their conduct; (2) defendants' conduct was

extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized society; (3) defendants' conduct caused Wilber emotional distress; and (4) the emotional distress suffered by Wilber was severe and of a nature that no reasonable person could be expected to endure.  Conley v. Romeri, 60 Mass. App. Ct. 799, 803 (2004).

The test for intentional infliction of emotional distress is demanding, and requires behavior that is "extreme and outrageous . . . beyond all possible bounds of decency and . . . utterly intolerable in a civilized society." Id. at 803.  Conduct by police officers in carrying out their obligations as law enforcement officials cannot be deemed extreme and outrageous. See, e.g., Lund v. Henderson, 22 F. Supp. 3d 94, 106 (D. Mass. 2014) (unlawful arrest alone does not rise to the level of extreme and outrageous conduct); Aguoji v. Harvard Univ., 77 Mass. App. Ct. 1115 (2010) (unpublished) ("The arrest of a person upon the basis of probable cause to believe that he has committed, or is committing, a criminal offense does not constitute 'extreme or outrageous' conduct, 'beyond all possible bounds of decency and utterly intolerable in a civilized community.'"); Godette v. Stanley, 490 F. Supp. 2d 72, 81 (D. Mass. 2007) (finding that even arrest made without probable cause did not rise to the level of extreme and outrageous conduct).

Even when viewing the facts in the light most favorable to Wilber and indulging all reasonable inferences in his favor, the Court finds that he has failed to put forth any evidence that would enable a reasonable fact finder to find extreme and outrageous conduct by the defendants. Accordingly, with respect to Wilber's claim of intentional infliction of emotional distress, the defendants' motion for summary judgment is granted.

## C.  **Officer Rogers**

Officer Rogers lacks sufficient personal involvement in Wilber's arrest to be liable for any of the claims alleged against him.  The undisputed facts in this case indicate that Officer

Rogers booked Wilber, but was not involved in Wilber's arrest and did not read the police report on the day of the arrest.[62]  Therefore, Officer Rogers had no personal involvement in Wilber's arrest, which is the basis for Wilber's claims for civil rights violations, false arrest, and false imprisonment.  Because there is no genuine issue of material fact regarding Officer Roger's lack of personal involvement in the arrest, liability cannot attach as a matter of law.  See Eason, 824 F. Supp. 2d at 242 (under both state and federal claims, a police officer must be personally involved in order for liability to attach).  Furthermore, there are no facts alleged with respect to Officer Roger's role in prosecuting the case against Wilber.  For all these reasons, Wilber's motion is denied and the defendants' motion is granted with respect to all claims alleged against Officer Rogers.

## V.     CONCLUSION

For the foregoing reasons, Wilber's partial motion for summary judgment is denied and the defendants' motion for summary judgment is granted.

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge

---

[62] Def. SOF ¶¶ 56, 60, 61; Resp. to Def. SOF ¶¶ 56, 60, 61.